UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PARTNERS IN FORESTRY COOPERATIVE,
et al.,

       Plaintiffs,

                                     Case No.  2:12-CV-184

v.

                                     HON. ROBERT HOLMES BELL

UNITED STATES FOREST SERVICE, et al.,

       Defendants.

_____/

## O P I N I O N

    In this action for declaratory and injunctive relief, Plaintiffs allege that the United States Forest Service's proposed exchange of federal land for private land violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370(d), and its implementing regulations, 40 C.F.R. §§ 1500-1508. (ECF No. 18, Am. Compl.) This matter is before the Court on Plaintiffs' motion for summary judgment (ECF No. 58), Plaintiffs' motion for extension of time to file reply (ECF No. 70), and on the Federal Defendant's motion to strike affidavit (ECF No. 73).  For the reasons that follow, Plaintiffs' motion for extension of time will be granted, Defendant's motion to strike will be granted, Plaintiffs' motion for summary judgment will be denied, and judgment will be entered in favor of Defendants.

## I.

This is a request for review under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-706, of a decision by the Forest Supervisor for the Ottawa National Forest to approve the  Delich Land Exchange Project (the "Project"), a project involving the conveyance of a single 421-acre parcel of private land owned by Robert D. Delich and Lisa Delich adjacent to the southern boundary of the Porcupine Mountains Wilderness State Park in exchange for five[1] comparatively small scattered parcels of federal land in Ontonagon County totaling 240 acres.  (DN/FONSI, AR 1889).[2]

In January 2010, the Forest Service issued an Environmental Assessment ("EA") for the Delich Land Exchange Project.  (AR 1202.)  In February 2011, the Acting Forest Supervisor entered a Decision Notice and Finding of No Significant Impact ("DN/FONSI"). (AR 1292.) An administrative appeal was taken, and the decision was reversed.  (AR 1370.) In October-November 2011, the Forest Service issued a Revised EA.  (AR 1554.)  In December 2011 the Forest Supervisor issued a revised DN/FONSI, approving the Delich Land Exchange based upon his  determination that it would serve the public interest, would further goals of the Ottawa National Forest and the U.S. Forest Service, and would have no significant impact on the environment.  (AR 1890-95.)  The Forest Supervisor specifically

---

[1] Although the initial proposal was to exchange seven federal parcels for one private parcel, parcels 5 and 6 were removed from the exchange, and the project that was ultimately approved by the Forest Service was for the exchange of five federal parcels.

[2] The Administrative Record ("AR") (ECF No. 54) has not been filed electronically, but is available for review at the courthouse.

found that "[o]wnership consolidation of this land will reduce complexity of the land ownership pattern, decrease land management costs, and offer additional semi-primitive, non-motorized dispersed recreation opportunities." (Rev. EA 3, AR 1891.) Five administrative appeals were taken. (AR 1928, 1942, 1959, 2016, 2059.) On April 12, 2012, the Regional Forester affirmed the Forest Supervisor's DN/FONSI. (AR 1940, 1957, 2014, 2045, 2075.)

Plaintiffs are two nonprofit organizations and seven individuals who are concerned with the public lands at issue.[3]  Plaintiffs filed this action against the United States Forest Service, Robert D. Delich, and Lisa Delich, challenging the Forest Service's approval of the Delich Land Exchange Project ("Project").[4]  Plaintiffs seek an order declaring that the Forest Service failed to comply with NEPA and enjoining Defendants from undertaking the land exchange unless and until the Forest Service complies with NEPA and the APA.  Plaintiffs have filed a motion for summary judgment in their favor on their claim.

## II.

Before considering Plaintiffs' motion for summary judgment, the Court will address the two procedural motions.  First, Plaintiffs have moved for a one-day extension of the

---

[3]Plaintiffs are Partners in Forestry Cooperative, Northwood Alliance, Inc., Joe Hovel, Rod Sharka, Sherry Zoars, Steve Garske, Rich Sloat, Sid Harring and Catherine Parker.

[4]Plaintiffs have named the Deliches as defendants solely for purposes of obtaining effective injunctive relief.  Because Plaintiffs' motion for summary judgment only challenges the validity of the action taken by the Forest Service, the use of the term "Defendant" in the singular will refer to Defendant Forest Service.

3

deadline for filing their reply brief. (ECF No. 70.) The motion is not opposed and will be granted.

Second, Defendant's have moved to strike Plaintiffs' submission of an appraisal and declaration of counsel. (ECF No. 73.) In their reply brief, Plaintiffs cited for the first time to an appraisal (the "Appraisal") that is not part of the Administrative Record filed by Defendant. (Reply Br. 9-10, ECF No. 71.) Plaintiffs subsequently submitted excerpts from the Appraisal and a declaration of counsel in support. (ECF No. 72.) Defendant has moved to strike Plaintiffs' submission because (1) it is untimely, (2) it violates Local Court Rule 7.1, and (3) Plaintiffs have not met their burden to show that the Administrative Record should be supplemented. (ECF No. 73.)

Plaintiffs filed the Appraisal seven and a half months after the deadline set in the Case Management Order (ECF No. 30) for raising objections to the Administrative Record, and they did not file a motion to extend the deadline or to expand the Administrative Record. Plaintiffs' only explanation is that they did not realize that the Appraisal was not in the 5,000+ page Administrative Record until they attempted to cite to it. (Pl. Reply at 10, n.2.) The Court declines to address these procedural issues, and turns instead to Defendant's third argument, which addresses the merits of Plaintiffs' request to supplement the Administrative Record.

There is no dispute that the Appraisal was prepared for the Forest Service for purposes of the Delich Land Exchange and was reviewed by individuals within the Forest Service as

part of the decision-making process concerning the Delich Land Exchange.  The Appraisal

is referenced in the Revised Environmental Assessment prepared by Defendant.[5]  Defendant

nevertheless contends that the Appraisal should not be made part of the Administrative

Record because it was not considered by the Forest Supervisor when he approved the Project;

he considered the Regional Review Appraisers' evaluations of the full Appraisal, and those

evaluations are in the Administrative Record.  (AR 680-734; 1489-92.)  Plaintiffs respond

that the Appraisal is part of the "whole record" that was before the Forest Service, and that

they are not seeking to supplement the Administrative Record, but rather to complete the

record to include materials that should have been there from the start.

The APA provides that in reviewing agency action, "the court shall review the whole

record or those parts of it cited by a party."  5 U.S.C. § 706; *Citizens to Preserve Overton

Park v. Volpe*, 401 U.S. 402, 420 (1971) (noting that review is to be based on "the full

administrative record" that was before the agency at the time of the decision).  The court's

review is "based on the record the agency presents to the reviewing court."  *Florida Power

& Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).  The administrative record includes "all

materials 'compiled' by the agency that were 'before the agency at the time the decision was

made.'"  *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (quoting  *James Madison

Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir.1996)).  The agency's designation of

---

[5]"A valuation of the properties in this exchange has been completed by a licensed and qualified appraiser and based on that work it was concluded that this exchange meets the requirement under the law."  (Rev. EA, AR 1568).

the Administrative Record is entitled to a presumption of regularity.  *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993) ("[D]esignation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity.").  "The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary."  *Id.  See also United States v. Martin*, 438 F.3d 621, 634 (6th Cir. 2006) (noting that agency action is entitled to a presumption of regularity that may be overcome only by "clear evidence").

As a general rule, judicial review of agency action is limited to a review of the administrative record.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").  There are exceptions to this rule. *See*, *e.g.*, *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (listing 8 exceptions, including "when an agency considered evidence which it failed to include in the record.").  However, before invoking an exception, a plaintiff is generally required to make "a strong showing of bad faith."  *Sierra Club*, 120 F.3d at 638 (quoting *James Madison*, 82 F.3d at 1095) (internal quotations omitted); *see also Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 198 (D.D.C. 2005) (noting that before invoking an exception, "the plaintiff must demonstrate bad faith or improper behavior on the part of the agency, or that, 'the record is so bare that it prevents effective judicial review.'").

Plaintiffs are not challenging the valuation of the property, so the Appraisal has little

relevance to the issues on review.  Although the Appraisal was cited in documents considered by the Forest Supervisor, there is no requirement that the administrative record include all underlying sources unless the report relies so heavily on the underlying sources that the agency might fairly be said to have considered the sources merely by considering the documents in which they were cited.  *Sequoia Forestkeeper v. U.S. Forest Serv.*, No. 109CV00392, 2010 WL 2464857, at *6 (E.D. Cal. June 12, 2010).  To the extent that the Appraisal is relevant to the issues on review, much of the information from the Appraisal is captured in other documents that are part of the Administrative Record.  Plaintiffs have not shown that the Appraisal conflicts with the Regional Review Appraisers' evaluations, or that it adds anything of significance to the information already contained in the Administrative Record.  There is simply no suggestion that the Forest Service skewed the record by excluding information of great pertinence to this proceeding.  *See Envtl. Def. Fund, Inc. v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978).  Although the Appraisal could arguably have been included in the Administrative Record, Plaintiffs have not demonstrated that the Appraisal is necessary for adequate judicial review or that Defendant acted in bad faith in excluding it.  Defendant's motion to strike will accordingly be granted.

### III.

"The National Environmental Policy Act requires federal agencies to study the environmental impacts of 'major Federal actions significantly affecting the quality of the human environment.'"  *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir. 2014)

(quoting 42 U.S.C. § 4332(C)). In order to comply with NEPA, agencies are required to first prepare an "environmental assessment" in consultation with federal, state, and local agencies, the public and other interested parties. *Id.* (citing 40 C.F.R. § 1501.4(b)). "Based on that assessment, the agency decides whether the environmental effects require further study." *Id.* If no further study is required, the agency issues a "finding of no significant impact" ("FONSI"). *Id.* (citing 40 C.F.R. § 1501.4(e)). If further study is required, the agency prepares an "environmental impact statement" ("EIS"). *Id.* (citing 40 C.F.R. § 1501.4(c)-(d)). "In reviewing challenges to NEPA compliance, we give 'substantial deference' to the regulations promulgated by the Council on Environmental Quality (CEQ), the federal agency established to fill in the gaps of NEPA's regulatory scheme." *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 372 (1989)).

Challenges under NEPA are reviewed pursuant to the Administrative Procedures Act ("APA"). *Sierra Club*, 120 F.3d at 631. Courts review an agency's actions pursuant to the APA under the "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). "Through 'searching and careful' review, they ask whether the agency 'adequately studied the issue and [took] a hard look at the environmental consequences of its decision,' not whether the agency correctly assessed the proposal's environmental impacts." *Klein*, 753 F.3d at 580-81 (citations omitted).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a

8

court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "In reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotations and citations omitted). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). This Court does not "substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Crounse Corp. v. I.C.C.*, 781 F.2d 1176, 1193 (6th Cir. 1986).

## IV.

Plaintiffs allege that Defendant violated NEPA in four ways: (1) by failing to prepare an Environmental Impact Statement; (2) by failing to analyze an adequate range of alternatives; (3) by failing to adequately disclose and analyze environmental impacts; and (4) by failing to prepare a supplemental NEPA analysis.

### A.  Failure to Conduct a Full Environmental Impact Statement

"NEPA requires federal agencies to consider the environmental effects of federal actions." *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 442 (6th Cir. 2005) (citing

9

42 U.S.C. § 4321 *et seq*.).  "It 'sets forth essentially procedural requirements to assess environmental impacts of major federal actions.'"  *Id.* (quoting *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 414 (6th Cir. 2004)).  NEPA requires federal agencies to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  "To spare agencies the hardship of conducting exhaustive review of every [] proposal's environmental impact, CEQ authorized agencies to first prepare a less burdensome environmental assessment as a method for determining whether a proposal needed an environmental impact statement."  *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407-08 (6th Cir. 2013) (citing 40 C.F.R. § 1508.9).  This "less burdensome environmental assessment" or "EA" is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact," including brief discussions of the need for the proposal, alternatives, environmental impacts, and a list of individuals and agencies consulted.  40 C.F.R. § 1508.9.  "Though less demanding than an environmental impact statement, an environmental assessment still require[s] the authorizing agency to consider the environmental impacts of its proposals."  *Ky. Riverkeeper*, 714 F.3d at 408 (citing 40 C.F.R. § 1508.9(b)).  "If after preparing an environmental assessment the agency determines that the project will have no significant environmental consequences," as it did here, "it need not issue an environmental impact statement and instead may issue a finding of no significant

impact." *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006).  "An agency decision, based on an EA, that no EIS is required, can be overturned only if it is arbitrary, capricious, or an abuse of discretion."  *Crounse Corp. v. I.C.C.*, 781 F.2d 1176, 1193 (6th Cir. 1986).  "We will not 'substitute our judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue.'" *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995) (quoting *Crounse* , 781 F.2d at 1193).

Plaintiffs contend that the Forest Service violated NEPA by failing to prepare an EIS because impacts to certain resources and public controversy are "significant" within the meaning of NEPA.

Whether environmental impacts are "significant" under NEPA and thus warrant preparation of an EIS depends on their context and intensity.  40 C.F.R. § 1508.27.  Intensity refers to the severity of impact.  40 C.F.R. § 1508.27(b).  The NEPA regulations identify ten factors that should be considered in evaluating intensity.  Each of the ten factors is addressed in the DN/FONSI with references to those portions of the Revised EA where the issues are addressed in more detail.  (AR 1895-97.)

Plaintiffs have asserted that Defendant failed to adequately consider two of the ten factors:

> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

11

40 C.F.R. § 1508.27(b)(3), (b)(4).  "[A] project's potential to affect one of these factors does not require an agency to prepare an EIS.  The relevant analysis is the degree to which the proposed action affects this interest, not the fact it is affected."  *Hillsdale Envt'l. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1180 (10th Cir. 2012).

Plaintiffs contend that Defendant did not adequately consider unique characteristics of the federal land being conveyed.  In particular, Plaintiffs contend that "the land exchange will trade away old-growth, hemlock, cedar stands, and related wildlife habitat; and will remove from public ownership unique and rare geographic features, including Wildcat Falls, Scott & Howe Creek, bluffs and ledges, and other special parts of the public lands."  (Pls.' Br. 11-12, ECF No. 59.)

Contrary to Plaintiffs' assertions, the record demonstrates that Defendant did take a hard look at Plaintiffs' concerns regarding unique characteristics of the five federal parcels that were the subject of the exchange and did consider the degree to which the effects were likely to be controversial.  The Revised EA was prepared by an interdisciplinary team of scientists who investigated the environmental effects of the project on plants, wildlife, water, soil, recreation, and heritage resources.  (Rev. EA 15-55, AR 1572-1612.)  Defendant acknowledged in the DN/FONSI that "many of the commenters have stated that they believe the cedar, hemlock, and old growth components found on the federal parcels near County Line Lake to be 'rare' and 'unique'."  (DN/FONSI 7, AR 1895.)  Defendant investigated these concerns, and concluded that the impacts were not significant:

The Revised EA demonstrates that these resources are found throughout the Ottawa (pp. 18-19, 21-29), and that the exchange would result in less than 0.003%[6] reduction in total acres of classified old growth found within Management Area 2.1; the appropriate scale at which it is reasonable to assess the effects of the exchange based on Forest Plan direction (p. 2-24).

(DN/FONSI 8, AR 1895-96 (footnote inserted.)   The Revised EA provides that if the exchange were to take place there would be a reduction of 61 acres that are currently classified as old growth.  (AR 1582, 1585.)  The EA concluded that "given the current amount of over 20,000 acres of classified old growth and future classifications from VMPs [vegetation management projects] that could occur in MA [management area] 2.1, the cumulative effect from reduction of 61 acres or less than 1% of old growth would be minor and would not cause substantial change at the MA scale."  (AR 1586.)  This conclusion takes into consideration all factors of old growth characteristics outlined in the Forest Plan including those features that the federal parcels lack, such as connectivity and structural complexity.  (Rev. EA 28, AR 1585.)  The Forest Supervisor concluded:  "Although I recognize and understand public concerns pertaining to existing old growth stands, hemlock and cedar, and Wildcat Falls, the public and natural resource benefits of moving forward with the exchange clearly exceed those analyzed and disclosed for the No-Action alternative."  (FONSI 4-5, AR 1892-93.)

Defendant also acknowledged that one of the greatest concerns expressed by the

---

[6]The Appeal Review Officer noted that there are typographical errors related to the reduction in old growth, but that it appears that the correct percentage is 0.3%.  (AR 1997, n.8.)

13

commenters pertained to parcel 3, which contains Wildcat Falls on Scott and Howe Creek.

> This waterfall and the natural features associated with the area provide a different environment than can be commonly seen in the project area and it is considered a special place by generations of local residents.

(FONSI 5, AR 1893.)  Defendant acknowledged that the falls have given some who visit it "a sense of place and attachment to the area."  (FONSI 8, AR 1896.)  Plaintiffs have argued that Wildcat Falls is unique because of its proximity to the communities of Eagle River, Land O Lakes, and Watersmeet, and because it is easily accessible.  Defendant considered these concerns.  As noted in the Revised EA:

> The most notable recreation experience is the opportunity to visit scenic Wildcat Falls located in Federal parcel 3.  The falls are listed on the Ottawa's list of waterfalls to see.  There is short hike on an unmarked trail to Wildcat Falls; this destination has appeal to many because of its location and its features.

(Rev. EA 41-42, AR 1598-99.)  Defendant understood that one of the most notable effects of the exchange would be the "lost recreational opportunity for visiting the scenic Wildcat Falls via short hike within parcel  3."  (*Id.*)  Despite this loss, the Revised EA indicated that "there are many other opportunities within the Ottawa to gain similar recreation experiences."  (Rev. EA 44, AR 1601.)  Defendant concluded that:

> while the falls are appealing, they are in fact not unique in regards to their particular form or character.  The site itself is also not unique in the sense that it has no historical significance and similar sites may be found in many places in the Upper Peninsula.

(FONSI 8, AR 1896.)

14

Plaintiffs also contend that Defendant did not adequately consider the controversial nature of the exchange.  "'The term "controversial" refers to cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use.'"  *Town of Cave Creek, Arizona v. F.A.A.*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir.1982)); *see also Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 234 (5th Cir. 2006) (noting that "controversial" is usually taken to mean more than some public opposition to a particular use); *Ind. Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003) (noting that the controversy factor "considers whether there is a substantial dispute about the size, nature or effect of an action in the relevant community").  Defendant concluded that, while the project would not be acceptable to all people, the effects of the proposal were reasonably predictable and were not likely to be highly controversial in view of the fact that the best available science had been used in  analyzing the physical, biological, and social issues.  (FONSI 8, AR 1896.)

This Court's role is not to substitute its judgment for that of the Forest Service.  *See Kelley*, 42 F.3d at 1518.  The Administrative Record reflects that Defendant listened to the public comments, studied the issues, and arrived at a reasonable determination that the characteristics of the federal parcels were not unique, that the land exchange was not likely to be highly controversial, and that the land exchange would not have a significant effect on the environment.  There is no substantial dispute about the size, nature or effect of the

exchange on the relevant community.  The effects were examined and understood.  Although Plaintiffs disagree with Defendant's decision not to conduct a full EIS, Plaintiffs have not convinced the Court that Defendant's determination that the project will have no significant environmental consequences, and that it need not issue an EIS, was arbitrary or capricious.

**B.  Failure to Adequately Disclose and Analyze Environmental Impacts**

Plaintiffs contend that the EA fails to adequately analyze the direct, indirect, and cumulative effects of the land exchange on various parts of the environment, including Wildcat Falls, perennial streams, old growth hemlock and other native species, and recreational interests.

NEPA regulations require EAs to include "brief discussions of . . . the environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9(b).  Impacts include direct, indirect, and cumulative impacts.  40 C.F.R. §§ 1508.7, 1508.8.  There is no dispute that Chapter 3 of the Revised EA includes discussions on the direct, indirect, and cumulative environmental impacts of the proposed exchange on Wildcat Falls, perennial streams, old growth hemlock and other native species, and recreational interests.  (Rev. EA 15-54; AR 1572-1611.)   The discussion of environmental consequences in the Revised EA is supported by dozens of investigations, surveys, evaluations, reports, photographs, and maps submitted by specialists in the various resource areas, (Docs. for Original EA, AR 377-1141; Docs. for Rev. EA, AR 1436-1531), and by extensive references to the relevant literature consulted (AR 2173-4997).  Defendant also responded to public comments, which involved further

16

consideration of the Project's impacts.  (Resp. to Original EA, AR 1261-90; Resp. to Rev. EA, AR 1554-1632.)

Plaintiffs have not challenged the information considered by Defendant.  Instead, they contend that more analysis was required, and they challenge the conclusions Defendant has reached.  Although Plaintiffs dispute the weight Defendant accorded certain information and the conclusions Defendant drew from that information, it is not this Court's role to secondguess the correctness of Defendant's decisions.  *See Klein*, 753 F.3d at 580-81.  The Court is satisfied that Defendant adequately studied the issues and took a hard look at the environmental consequences of its decision.  Plaintiffs have not persuaded the Court that Defendant's analysis of the environmental impacts was arbitrary or capricious.

**C.  Failure to Analyze an Adequate Range of Alternatives**

Plaintiffs contend that Defendant violated NEPA by failing to analyze a reasonable range of alternatives.  The Revised EA only addressed in detail two alternatives:  the proposed exchange, and the "no-action" alternative.  Plaintiffs contend that other feasible alternatives had been suggested, including purchasing the private parcels outright, or withholding three parcels from the exchange.

NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  The implementing regulations require agencies to "[r]igorously explore and objectively evaluate

all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).

"[T]he range of alternatives that must be discussed under [NEPA] is a matter within an agency's discretion.  In exercising that discretion, the agency should consider the purpose of the project, and the environmental consequences of the project."  *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 342 (6th Cir. 2006) (internal quotations and citations omitted).  The stated goal of a project necessarily dictates the range of reasonable alternatives.  *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).  NEPA does not require an agency to pursue alternatives that "present unique problems, or are impractical or infeasible."  *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 470 (6th Cir. 2014); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) ("CEQ regulations oblige agencies to discuss only alternatives that are feasible, or (much the same thing) reasonable."). When an agency prepares an EA as opposed to an EIS, it has "fewer reasons" to consider alternatives because it has already determined that the proposed project will have minimal environmental consequences.  *Save Our Cumberland Mtns.*, 453 F.3d at 342.

Although Defendant only addressed two alternatives, it noted that other alternatives had been eliminated because they were not viable.  Excluding federal parcels 1, 2 and 3 from the exchange was eliminated because it would not achieve the goal of consolidating NFS land and concentrating resource management efforts in more effective blocks.   (Rev. EA

18

12, AR 1569; DN/FONSI 4-5, AR 1892-93; Resp. to Comments 8-9, AR 1737-38.)  There is evidence in the record that exchanging parcels 1, 2, 3, 4, and 7 was the only configuration acceptable to Mr. Delich. (Tx. Contact Record, AR. 1432.)  The Deliches sought the federal parcels, in part, for selective timber management, and Parcel 2 contains the most valuable timber.  (AR 1568; AR 688.)  Defendant concluded that "the option of dropping parcels 1, 2 and/or 3, would have resulted in a failed exchange agreement and the failure to meet the purpose and need of the project identified on page 3 of the Revised EA."  (DN/FONSI 5, AR 1893.)

The other alternative of purchasing the 421 acres was eliminated because the landowners (the Deliches) were only interested in pursuing an exchange of lands; they were not interested in selling the parcels.  (Rev. EA 13, AR 1570; DN/FONSI 5, AR 1893.)  It was also eliminated because current levels of appropriated funding for acquisitions would prevent the purchase from occurring.  (*Id.*)

NEPA does not dictate the nature of the alternatives that must be considered; what alternatives will be considered is a determination for the agency to make.  *Latin Americans*, 756 F.3d at 472.  The fact that Defendant considered only two alternatives does not establish a NEPA violation as NEPA does not contain a requirement concerning the number of alternatives that must be considered.  Here, the only two alternatives identified by Plaintiffs that were not considered were found by Defendant not to be viable.  There is nothing in the record to suggest that Defendant's determination that these alternatives were not viable was

unreasonable, arbitrary, or capricious.

Plaintiffs contend that if the two eliminated alternatives do not meet the asserted purpose and need of the proposal, then Defendant violated NEPA by defining the purpose and need for the project too narrowly.   In support of this argument, Plaintiffs cite *Muckleshoot Indian Tribe v. U.S.Forest Service*, 177 F.3d 800 (9th Cir. 1999), where the Ninth Circuit held that the Forest Service failed to consider an adequate range of alternatives when it approved the exchange of Forest Service property with significant historic features for private land without considering the alternative of purchasing the property.   The Forest Service asserted that because the purpose of the transaction was to carry out an "exchange" and not a purchase, it was not required to consider the alternative of purchasing the property. *Id.* at 814. The Ninth Circuit rejected the Forest Service's assertion that an exchange of lands for federal monies would be inconsistent with the stated purpose of the proposal.   "Were we to construe the statement of purpose as limiting the transaction to land-for-land exchanges, it would certainly be too narrow to meet the standards for an appropriate statement of purpose as articulated in *City of Carmel*, 123 F.3d at 1155." *Id.* at 814 n.7.

Plaintiffs' reliance on *Muckleshoot* is misplaced.   First, the purpose and need identified by Defendant was not limited to exchanges.   The FONSI provides that the overall purpose and need for the project is "to adjust landownership" pursuant to the Forest Plan goal "to facilitate restoration, protection and management of resources; and to provide recreation opportunities."   (DN/FONSI 2, AR 1890.)   The stated goal is essential to consolidate land

20

ownership for more efficient and effective land management.  (Rev. EA 3, AR 1560.)  The stated purpose is adjustment of landownership, not necessarily a land exchange.   Second, Defendant did not reject the purchase option because it was inconsistent with the purpose of carrying out an exchange, but because it would not have been approved by the landowners. Defendant could not achieve its goal of consolidating Federal Forest lands except by an exchange.  In other words, purchase was not a viable option for achieving the goal of consolidating forest property.  By contrast, in *Muckleshoot* there was no suggestion that the landowners would not have accepted a purchase option.  The Forest Service in *Muckleshoot* simply asserted that it was not required to consider the purchase alternative because it was inconsistent with the purpose of the transaction. 177 F.3d at 814.

Plaintiffs also contend that Defendant's purpose and need was unreasonably narrow because it restricted the proposed action to the one alternative that fulfilled the private landowner's needs.  Plaintiffs direct the Court's attention to the Ninth Circuit's observation that "[r]equiring agencies to consider private objectives . . . is a far cry from mandating that those private interests define the scope of the proposed project."  *National Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2009).

The record does not support Plaintiffs' argument that the Deliches' interests defined the scope of the proposed project.  Defendant's stated purpose for the project was to consolidate Forest Service lands for more efficient management of resources and to provide recreation opportunities.  The fact that Defendant could only obtain the Deliche property that

21

was contiguous to the Federal Forest property if the Deliches agreed to the parcels to be exchanged does not mean that the Deliches' interests improperly defined the scope of the project. The purpose and needs in this case differ materially from those considered in *National Parks*, where the federal agency did not dispute that the majority of the stated purposes for the project responded to the private party's goals, not to those of the federal agency. 606 F.3d at 1070.

Plaintiffs have not shown that there were feasible alternatives that were not considered by the agency, nor have they shown that Defendant's statement of the needs and purpose was defined too narrowly.

## D. Failure to Prepare a Supplemental NEPA Analysis

Plaintiffs contend that Defendant also violated NEPA by failing to consider new circumstances that arose after it prepared the EA.

The NEPA regulations require agencies to prepare supplements to their environmental impact statements if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). Plaintiffs contend that two new circumstances triggered the duty to supplement the EA: (1) plans for moving the North Country Scenic Trail further north; and (2) the sighting of possible lynx tracks in the vicinity of Wildcat Falls.

The Revised EA provided that one of the recreational benefits of the proposal was that acquisition of the Delich parcel would provide protection for that portion of the North

22

Country Scenic Trail ("NCST") that was adjacent to the Delich property.  (Rev. EA 43, AR 1600.)  Defendant subsequently learned of plans to move the NCST away from the Delich property and onto other National Forest lands.  (SIR re NCST Relocation, AR 2166.) Defendant prepared a Supplemental Information Report ("SIR"), a formal instrument for documenting whether new information is sufficiently significant to require a  Supplemental Impact Statement.  *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 555 (9th Cir. 2000).  In the SIR, Defendant documented the interdisciplinary team's review of the new NCST information, and concluded that a supplement or revision of the Revised EA was not necessary because protection of the NCST trail was only one of several factors documented in the purpose and need statement for the land exchange, and because it was probable that a recreation trail (with or without NCST designation) would still remain at its current location on the boundary of the Deliches' parcel for the foreseeable future.  (SIR 4, AR 2169.)  Defendant concluded that relocation of the trail does not present a seriously different picture with regard to the significance of environmental effects.  (*Id.*)

After the Revised EA and DN/FONSI were prepared, Defendant also received a report that large, unidentified felid (cat) tracks had been observed by the public in the vicinity of Wildcat Falls that could have been made by a mountain lion or Canada lynx.  The Revised EA and DN/FONSI had concluded that the project would have no effect on any federally listed threatened or endangered species including the Canada lynx.  (Rev. EA 43, AR 1600; DN/FONSI, 10, AR 1898.)  Accordingly, the possible presence of lynx in the project area

presented new information.  Forest staff biologists investigated the unidentified tracks through additional tracking, trail cameras, and hair snares. (SIR re Felid Tracks 2, AR 2156.) No additional tracks or other evidence of the presence of a large cat was found in the area. (*Id.* at 2157.)  Defendant also sent photographs of the tracks to biologists in the area, but there was no consensus among the experts regarding the species of cat that had made the tracks.  (*Id.*)  Even if the tracks were made by lynx, there was no further evidence that the animal was still in the area.  The Revised EA took into consideration that lynx, a very rare species that has not been sited on the Forest for nearly 50 years, may on occasion pass through the Forest, dispersing from their current range.  (*Id.*).  Because the possibility that a lynx had passed through the area was consistent with the information contained in the Revised EA and the DN/FONSI, Defendant determined that the tracks did not present a seriously different picture with regard to the environmental effects of the project, and did not require supplementation of the Revised EA.  (*Id.*)

Upon review, the Court is satisfied that Defendant took a hard look at the new information regarding the potential relocation of the NCST trail and the possible lynx tracks, and that its conclusion that they did not constitute "significant" new circumstances was not arbitrary or capricious.

## V-.

After conducting a searching and careful review of the record, the Court concludes that Defendant did not act arbitrarily or capriciously in approving the Delich Land Exchange

Project.  The record makes clear that Defendant adequately studied the proposal and took a hard look at the environmental consequences of its decision.  Accordingly, Plaintiffs' motion for summary judgment will be denied.

The parties indicated in their Joint Status Report that they anticipated that this case would be decided based on cross-motions for summary judgment.  (Status Rpt. ¶ 4.12, ECF No.28.)  Defendants did not file a motion for summary judgment, but did request judgment in their favor in response to Plaintiffs' motion.  When sufficient notice and an opportunity to respond has been given, the Court may enter summary judgment for the non-movant.  Fed. R. Civ. P. 56(f)(1).  The Court is satisfied that Plaintiffs have had sufficient notice and opportunity to respond to Defendants' request for summary judgment.  The Court is also satisfied that entry of judgment for Defendants does not raise any issues that were not raised by Plaintiffs' motion.  Defendants are entitled to summary judgment for the same reasons that Plaintiffs' motion for summary judgment is being denied.

An order and judgment consistent with this opinion will be entered.


Dated: September 9, 2014                    /s/ Robert Holmes Bell_____
                                            ROBERT HOLMES BELL
                                            UNITED STATES DISTRICT JUDGE